# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **JEFFREY S. MEADOWS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NORTHROP GRUMMAN INNOVATION** | ) | |
| **SYSTEMS, INC.,** | ) | **Civil Action No. 7:19-cv-00394** |
| | ) | |
| **BAE SYSTEMS, INC.,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BAE SYSTEMS ORDNANCE** | ) | |
| **SYSTEMS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

COMES NOW the Plaintiff, Jeffrey S. Meadows ("Meadows"), by counsel, and files this Memorandum in Support of Motion to Remand. Defendants BAE Systems, Inc. and BAE Systems Ordnance Systems, Inc. (collectively, "BAE") have removed this action from the Montgomery County Circuit Court to this Court. (*See* Notice of Removal, ECF No. 1). Defendant Northrop Grumman Innovation Systems, Inc. ("NGIS") has consented to the removal. (*Id.* at ¶ 16). For the reasons that follow, there is no basis for this Court to exercise jurisdiction over this action, which on its face brings claims under Virginia common and statutory law. Therefore, pursuant to 28 U.S.C. § 1447(c), this action must be remanded back to the Montgomery County Circuit Court.

## FACTS AND PROCEDURAL HISTORY

This is an action for defamation, defamation *per se*, wrongful discharge, common law conspiracy, and business conspiracy under Virginia Code § 18.2-500, related to Meadows'

employment history with Defendants and Defendants' improper actions following their near-simultaneous discharge of Meadows' respective employment with BAE and Orbital ATK, Inc. ("Orbital ATK"), Defendant NGIS's predecessor in interest. The facts of this case are fully alleged in Meadows' Amended Complaint[1] and summarized herein.

In 2007, Meadows began working for Orbital ATK. (*See* Amended Complaint ¶ 10). As an Orbital ATK employee, Meadows worked on, among other things, proposals related to the operation, management, and modernization of facilities, and in various locations, including Virginia, Australia, and Utah. (*Id.* at ¶¶ 11–13). Orbital ATK also allowed Meadows to work remotely from his home in Montgomery County, Virginia, in exchange for remaining at Orbital ATK when Meadows had desired to accept a job with BAE. (*Id.* at ¶¶ 17–20). Later, however, Meadows decided to take a job with BAE, and informed both BAE and Orbital ATK of his impending dual employment. (*Id.* at ¶¶ 24–26). As a BAE employee, Meadows either worked on site at the Radford Army Ammunition Plant ("Arsenal") or remotely from his home in Montgomery County, Virginia. (*Id.* at ¶ 28).

Independent of Meadows' disclosures to BAE and Orbital ATK, BAE knew that Meadows also worked for Orbital ATK because, on more than one occasion, Meadows' supervisors at BAE asked Meadows to provide confidential, proprietary Orbital ATK information for BAE's own benefit. (*See id.* at ¶¶ 39–52). For example, in 2016, Meadows' supervisor at BAE, Michael Bate, asked Meadows to provide an Orbital ATK acid facility modernization proposal, which Meadows refused to do but which clearly indicates that BAE knew that Meadows was contemporaneously employed by Orbital ATK. (*Id.* at ¶¶ 41-42).

---

[1] The Amended Complaint is attached to Defendants' Notice of Removal. (*See* ECF No. 1, Ex. A).

2

Despite this prior knowledge, BAE discharged Meadows on June 23, 2017, by a letter that Meadows received at his home in Montgomery County, Virginia, ostensibly for Meadows' purported violation of BAE's conflict of interest disclosure policy; the other ostensible reason was Meadows' purported violation of BAE's timekeeping policy. (*Id.* at ¶ 56; Ex. B). This discharge was preceded by Meadows' being escorted out of the Arsenal, without explanation, on May 1, 2017, and BAE temporarily suspending Meadows. (*Id.* at ¶¶ 53–54).

BAE's discharge of Meadows was precipitated by Orbital ATK reporting to BAE that Meadows had accepted a new, full-time position with Consolidated Nuclear Security, LLC ("CNS"), a company affiliated with Orbital ATK. (*Id.* at ¶¶ 63–65). In fact, although Meadows was considering that position, he ultimately did not accept it, motivating Orbital ATK to retaliate against Meadows by informing BAE that he had. (*Id.*). In this way, Orbital ATK conspired with BAE to have Meadows wrongfully discharged. BAE, however, had additional, independent motives to discharge Meadows, particularly Meadows' failure to provide BAE with confidential, proprietary Orbital ATK documents. (*See id.* at ¶¶ 39–52, 160, 164).

Defendants' improper actions did not end with Meadows' discharge, however. On July 25, 2017, BAE notified the Office of Inspector General of the Department of Defense ("DOD") on its own initiative, alleging that Meadows was employed by Orbital ATK while working for BAE without BAE's knowledge or permission, and that Meadows had mischarged his time related to "non-work activities" while employed by BAE. (*Id.* at ¶ 71). Contrary to BAE's characterization,[2] this was not a *mandatory disclosure* because the allegations were false and a mere pretense for BAE's discharge of Meadows as retaliation for his failure to provide BAE with confidential, proprietary Orbital ATK documents. Indeed, BAE's communications to the DOD and Department

---

[2] (*See, e.g.*, Notice of Removal, ECF No. 1, at ¶ 9).

3

of Navy ("DON") included several misrepresentations. (*See id.* at ¶¶ 78–83; Ex. E). Ultimately, the DON determined that the evidence did not support BAE's allegations. (*Id.* at ¶ 87; Ex. G).

Based on these facts, and those alleged in the Amended Complaint, Meadows filed his Complaint in the Montgomery County Circuit Court for defamation, defamation *per se*, wrongful discharge, common law conspiracy, and business conspiracy under Virginia Code § 18.2-500, all claims arising under Virginia law, on May 11, 2018. Prior to serving Defendants, Meadows amended his Complaint and filed his Amended Complaint in the Montgomery County Circuit Court on April 24, 2019. Subsequently, BAE filed, and NGIS consented to, a Notice of Removal,[3] thereby removing this case from the Montgomery County Circuit Court to this Court.

---

[3] Attached to Defendants' Notice of Removal as Exhibit B is the Declaration of Matt Linkous. (*See* ECF No.1-2). Such declarations are permitted pursuant to 28 U.S.C. § 1746. However, that statute provides that such declarations *must* be dated. *See id.* (" . . . [S]uch matter may . . . be supported . . by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."). The Declaration of Matt Linkous, however, does not contain the "Executed on: (date)" language required by 28 U.S.C. § 1746. Accordingly, this Court should not consider the Declaration of Matt Linkous in ruling upon Meadows' Motion to Remand, Defendants' respective Motions to Dismiss (ECF Nos. 3 and 5), or any other matter. *See, e.g.*, *Rivera v. Allstate Ins. Co.*, 140 F. Supp. 3d 722, 729 (N.D. Ill. 2015) ("The consequence of the Rivera and Scheuneman declarations being undated. . . is that the declarations are not evidence and thus will be disregarded on summary judgment."); *Globalaw Ltd. v. Carmon & Carmon Law Office & Globalaw, Inc.*, 452 F. Supp. 2d 1, 28 n.11 (D.D.C. 2006) (noting that an undated affidavit was "in violation of 28 U.S.C. § 1746"); *Orr v. Orbis Corp.*, No. 1:07-CV-2653-TWT-SSC, 2010 U.S. Dist. LEXIS 86990, at *8 (N.D. Ga. July 30, 2010) ("Because the Simmons and Watson Declarations are not dated or signed, the court will not consider them in addressing Defendants' motion or Plaintiff's response . . . .").

4

## ARGUMENT

Meadows' Amended Complaint, on its face, brings claims under Virginia law, and there is not complete diversity between the parties.[4] Defendants nevertheless have removed this action on the basis that this Court has federal question jurisdiction, premised upon the federal enclave doctrine, under which certain land ceded by one of the several States to the United States becomes subject to federal jurisdiction. Defendants contend that the Arsenal in Radford, Virginia, is a federal enclave, and that because Meadows' employment with BAE required Meadows, at times, to work at the Arsenal, all of his claims are subject to exclusive federal jurisdiction. For the reasons discussed below, Defendants' argument for removal must be rejected. As an initial matter, Defendants have not shown that the Arsenal or, more specifically, "Building 220," where Meadows worked while on site at the Arsenal,[5] is a federal enclave. More importantly, Defendants have not shown that Meadows' claims arose in the Arsenal at all.

### I.    Legal Standard for Removal and Remand

Pursuant to federal law, "any civil action brought in a State court *of which the district courts of the United States have original jurisdiction*, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441 (emphasis added). District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. However, if the civil action is removed and the court does not,

---

[4] Meadows is a citizen of Virginia. NGIS and BAE Systems, Inc. are Virginia citizens because their respective principal places of business are in Virginia. Thus, for good reason, Defendants do not assert to have removed this action on diversity grounds.

[5] Defendants essentially base their removal of this action on Meadows' work-related activities in "Building 220" of the Arsenal. (*See* Notice of Removal, ECF No. 1). Thus, the only relevant question for the purposes of this action is whether "Building 220" of the Arsenal is located on a federal enclave.

in fact, have subject-matter jurisdiction, the district court *must* remand the case to the State court from which it was removed: "If at any time before final judgment it appears that the district court lacks subject-matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447. Accordingly, "questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must). be raised *sua sponte* by the court." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004).

"On a motion to remand, the burden of establishing federal subject-matter jurisdiction falls on the party seeking removal to the federal forum, which, in this case, is the Defendants." *Vill. Builders on the Bay, Inc. v. Cowling*, 321 F. Supp. 3d 624, 627 (E.D. Va. 2018).; *see also Nordan v. Blackwater Sec. Consulting, Ltd. Liab. Co. (In re Blackwater Sec. Consulting, Ltd. Liab. Co.)*, 460 F.3d 576, 583 (4th Cir. 2006). ("The party seeking removal bears the burden of demonstrating that removal jurisdiction is proper."). Federal courts have a "duty to construe removal jurisdiction strictly and resolve all doubts in favor of remand." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 336 (4th Cir. 2008). This is in part "because of the 'significant federalism concerns' implicated" by removal. *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (quoting *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994)). "Therefore, if federal jurisdiction is doubtful, a remand to state court is necessary." *Id.* (internal quotation marks and brackets omitted).

Where, as here, removal is based on 28 U.S.C. § 1331 (federal question jurisdiction), and not 28 U.S.C. § 1332 (diversity jurisdiction), the court must determine as a threshold question whether the plaintiff's claims arise under federal law. *See Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181 (4th Cir. 2014). Typically, "a case arises under federal law when federal law creates the cause of action asserted." *Id.* (quoting *Gunn v. Minton*, 568 U.S. 251, 257 (2013)).

In conducting this inquiry, the court must abide by the "well-pleaded complaint rule," which demands that the court limit to its consideration "the plaintiff's statement of his own claim[s] . . . unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Id.* (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988)).

## II. Defendants Have Not Met Their Burden of Showing That the Arsenal is a Federal Enclave

### A. The Existence of Judicial Subject-Matter Jurisdiction on Federal Enclaves is a Complex Question

Defendants' entire basis for removing this action, which on its face brings claims under Virginia common and statutory law, is the federal enclave doctrine. Under this doctrine, stemming from Article I, Section 8, Clause 17 of the United States Constitution,[6] a federal enclave "is created when a state cedes jurisdiction over land within its border to the federal government and Congress accepts that cession." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012); *accord Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 308 n.11 (4th Cir. 2013) (discussing the federal enclave doctrine). "The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves. But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force." *Allison*, 689 F.3d at 1237. State law enacted following the establishment of the federal enclave, however, is generally preempted. *Id.*

"[T]he existence of judicial subject-matter jurisdiction on federal enclaves is a 'complex question' that factors in federal policy, the state law at the time the land was acquired, whether

---

[6] "To exercise exclusive Legislation in all Cases whatsoever, . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. Art. I, § 8, cl. 17.

Case 7:19-cv-00394-MFU   Document 20   Filed 07/26/19   Page 7 of 24   Pageid#: 1020

that state law has been altered by federal legislation, and whether the federal government has

'exclusive, concurrent or proprietorial jurisdiction.'" *Hall v. Coca-Cola Co.*, No. 2:18cv244, 2018

U.S. Dist. LEXIS 175384, at *6 (E.D. Va. Oct. 10, 2018) (quoting *Celli v. Shoell*, 40 F.3d 324,

328 (10th Cir. 1994)). With respect to the latter factor, the district court in *United States v. Sadekni*

concisely summarized these types of jurisdiction:

> "Exclusive jurisdiction" is the same as "exclusive legislation," at least as that term
> is used in the federal Enclave Clause, and is present in situations in which the
> United States has received, by whatever method, all of the authority of a state, with
> no reservation made to the state except perhaps the right to serve process resulting
> from activities which occurred off the land. "Concurrent legislative jurisdiction"
> applies where, in granting the federal government authority that would otherwise
> amount to exclusive legislative jurisdiction over a certain area, the state reserves to
> itself the right to exercise, concurrently with the government, all of the same
> authority. With "proprietorial jurisdiction," the federal government has acquired
> some right of title to property in a state but has not obtained any measure of the
> state's authority over the same.

No. 3:16-CR-30164-MAM, 2017 U.S. Dist. LEXIS 28733, at *12–14 (D.S.D. Mar. 1, 2017) (citing

*Study of Jurisdiction over Federal Areas within the States, Part II*, at 11 [June 1957], *available at*

http://www.supremelaw.org/rsrc/fedjur/fedjur2.html). "The terms of the cession . . . determine the

extent of the Federal jurisdiction." *United States v. Unzeuta*, 281 U.S. 138, 142 (1930).

By statute, the jurisdiction of lands ceded by the Commonwealth of Virginia to the United

States is presumptively concurrent, a form of jurisdiction that typically does not implicate the

federal enclave doctrine. *Cf. Pratt v. Kelly*, 585 F.2d 692, 697 (4th Cir. 1978). (affirming that the

district court lacked subject-matter jurisdiction over a claim arising under land subject to the

United States' concurrent jurisdiction).[7] Pursuant to Virginia Code § 1-400, the Commonwealth gives "*conditional consent* . . . to the acquisition by the United States . . . of any lands in the Commonwealth . . . required for customhouses, post offices, *arsenals*, forts, magazines, dockyards, military reserves, or for needful public buildings," but cedes only "concurrent governmental, judicial, executive and legislative power and jurisdiction."[8] As the Supreme Court of Virginia has explained:

> It is well settled, however, that the mere ownership of land by the United States does not divest a state of its jurisdiction over that land, and that the nature and extent of the federal jurisdiction is dependent upon the consent of the state. The United States was ceded concurrent jurisdiction by statute . . . land to which it holds title within the Commonwealth. Any additional jurisdiction over this land can be relinquished only if the Commonwealth executes a deed of cession, and the deed must be formally accepted by the United States.

*Smith v. Commonwealth*, 219 Va. 455, 461, 248 S.E.2d 135, 139 (1978). (citations omitted).

Of course, as with any other ground for removal, it is the burden of the party seeking removal on the basis of the federal enclave doctrine to establish that the land in question is a federal enclave. *See, e.g.*, *Hall v. Coca-Cola Co.*, 2018 U.S. Dist. LEXIS 175384, at *18; *Ballard v.*

---

[7] Although *Pratt* does not mention the federal enclave doctrine directly, the decision clearly speaks to it. As one district court has observed:

> Once the state cedes concurrent jurisdiction . . . the rationale for applying "federalized" state law as the basis for § 1331 jurisdiction disappears. . . . The Fourth Circuit adopted this rationale in *Pratt v. Kelly* . . . in holding that federalized state law does not apply in a negligence suit arising from an automobile accident on federal land over which the state had concurrent jurisdiction.

*Sylvane v. Whelan*, 506 F. Supp. 1355, 1361 (E.D.N.Y. 1981).

[8] While Virginia Code § 1-400 applies to lands ceded "[o]n and after July 1, 1981," its predecessors, including that formerly codified at Virginia Code § 7-19, have provided for the same rule since at least before 1942, when Defendants assert the Arsenal was ceded to the United States. *See, e.g.*, *Waltrip v. Commonwealth*, 189 Va. 365, 369, 53 S.E.2d 14, 16 (1949). ("[The statute] grants to the United States concurrent jurisdiction over crimes and offenses committed on lands acquired since March 28, 1936. The ceding of the additional or exclusive jurisdiction is made by deed by the Commonwealth through the Governor and Attorney General . . . .").

9

*Ameron Int'l Corp.*, No. 16-cv-06074-JSC, 2016 U.S. Dist. LEXIS 147810, at *7 (N.D. Cal. Oct. 25, 2016); *Fuller v. TVA*, No. 1:04-cv-113, 2007 U.S. Dist. LEXIS 51238, at *6 (E.D. Tenn. July 13, 2007). Establishing "the existence of federal enclave jurisdiction generally requires a party to establish three elements." *Hall*, 2018 U.S. Dist. LEXIS 175384, at *18 (citing *Paul v. United States*, 371 U.S. 245, 265, 267 (1963)). These are (1) that the land was purchased "for the purpose of erecting forts, magazines, arsenals, dock-yards, or other needful building"; (2) that the state legislature consented to the federal jurisdiction; and (3) that the United States accepted the jurisdiction. *Id.* at *18–19 (quoting *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 U.S. Dist. LEXIS 52239, at *6-7 (E.D. La. May 13, 2011)). With respect to the last element and property acquired after 1940, the federal government must accept jurisdiction in a manner consistent with 40 U.S.C. § 3112 "by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated," because pursuant to that statute it "is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided by [§ 3112]." With respect to all of these elements, "mere conclusory statements that a piece of land is a federal enclave are not enough to meet defendant's burden in a notice of removal." *Id.* at *19.

> **B.  Defendants Have Failed to Establish that the United States Possesses Exclusive Jurisdiction Over the Arsenal and/or that the Arsenal is a Federal Enclave**

Defendants have failed to overcome their burden to show that federal subject-matter jurisdiction exists or, more specifically, to show that the United States has exclusive jurisdiction over the purported enclave, the Arsenal.

In the time since Defendants removed this action, both counsel for Plaintiff and counsel for Defendants have had the opportunity to review the evidence submitted in *Adams v. Alliant*

10

*Techsystems, Inc.*, 218 F. Supp. 2d 792, 796 (W.D. Va. 2002), a case in which the Court declined to reconsider its then-uncontested finding that the Arsenal was a federal enclave.[9] This evidence includes copies of the original 1942 Deed of Cession ("1942 Deed").[10] Based upon that review, Meadows acknowledges that, in 1942, the United States government apparently obtained exclusive federal jurisdiction over at least some portions of the Arsenal, including "Building 220." Yet, Defendants cannot meet their burden of proving that the Arsenal is a federal enclave by showing that it became one in 1942; rather, Defendants must show that the Arsenal was still a federal enclave *at the time of the events alleged by Meadows*. Thus, Defendants' sole reliance on *Adams*, *supra*, is fundamentally misplaced, because a case decided in 2002 cannot speak to the status of the Arsenal as a federal enclave between 2016 and 2017, the timeframe of Meadows' employment, at times, within the Arsenal. Indeed, there are factors that call into question whether the Arsenal—or, more specifically, "Building 220"—was still situated upon a federal enclave in the years relevant to this action. Such open questions must be resolved in favor of remand. *See Palisades Collections LLC*, 552 F.3d at 336.

First, records generated by the Commonwealth establish that not *all* of the Arsenal is subject to *exclusive* federal jurisdiction. In a Memorandum dated February 16, 1978, attached as

---

[9] The question of federal enclave jurisdiction in *Adams*, however, was somewhat of ancillary matter because the parties had agreed that the Arsenal was a federal enclave. Indeed, the plaintiffs in that case had not focused their arguments on the federal enclave doctrine—arguing against its applicability—"[u]ntil they moved for reconsideration." *Adams*, 218 F. Supp. 2d at 795. Thus, the balance of the opinion addresses other issues; the federal enclave question is subjected to very little analysis.

[10] The 1942 Deed, including attachments, is attached to this Memorandum as **Exhibit A**. The 1942 Deed is in fact composed of numerous deeds, transferring numerous parcels of land to the United States Government that would make up, among other properties, at least some part of the Arsenal. Upon information and belief, and upon counsel for Meadows' comparison of the 1942 Deed's maps with current, publicly available maps, the deed ceding the land upon which "Building 220" is situated is at pages 19-26 of the exhibit.

**Exhibit B**, Robert D. Perrow, then-Assistant Attorney General, provided a "master list" of federal enclaves in Virginia, wherein the Arsenal was listed as having the federal government's exclusive *and proprietary* jurisdiction. Consistent with that document, a "Jurisdictional Statement" dated July 25, 1985, shows that 84.45 acres of the Arsenal are owned by the United States in a *proprietorial* capacity. This statement is attached as **Exhibit C**. As discussed above, proprietary jurisdiction does not implicate the federal enclave doctrine. *Adams*, *supra*, does not discuss, and Defendants provide no evidence of, what parts of the Arsenal are exclusive or proprietary. It is entirely possible, then, that "Building 220" is on this acreage of the Arsenal that the United States does not possess exclusive jurisdiction of.

Second, the 1942 Deed's grant of exclusive jurisdiction was not absolute and in perpetuity. Rather, the deed provided:

> [I]n the event that said lands or *any part thereof* shall be sold *or leased* to any private individual, or any association or corporation, under the terms of which sale or lease the vendee or lessee shall have the right to conduct thereon any private industry or business, then the jurisdiction ceded to the United States over any such lands so sold or leased *shall cease and determine*, and thereafter *the Commonwealth of Virginia shall have all jurisdiction and power* she would have had if no jurisdiction or power had been ceded to the United States.

*See* **Exhibit A**, at 25 (emphasis added). The Commonwealth's reservation to recoup jurisdiction under these circumstances was by no means incidental. Virginia Code § 1-401(D), which was originally enacted by the General Assembly in 1940, *see* 1940 Va. Acts ch. 422, Item 761-762, requires such deeds of cession to provide for such a reservation. Indeed, so strong is Virginia's policy that the United States not retain exclusive jurisdiction over property it has sold or leased that any omission of that language from deeds of cession has no effect: *See* Va. Code § 1-401(D). ("It is further provided that the reservations provided for in this subsection shall remain effective even though they should be omitted from any deed executed pursuant to this section.").

This provision provides, in part, that the United States would lose exclusive jurisdiction over any part of the Arsenal leased to a company conduct private industry or business thereon; though the United States would retain ownership, its jurisdiction would be merely *proprietary*. In other words, the United States' position with respect to the land in question would be no different than an ordinary owner's. This provision of the 1942 Deed is significant in this action because the Arsenal participates in the Armament Retooling and Manufacturing Support ("ARMS") program, under which space at the Arsenal is *leased* to private companies. *See* Declaration of Jeffrey S. Meadows, a copy of which is attached hereto as **Exhibit D**. Furthermore, at least one private company aside from BAE does business in "Building 220" of the Arsenal: General Dynamics Ordnance and Tactical Systems. *See id.* Per the terms of the 1942 Deed, which deprives the United States of exclusive jurisdiction over any leased part of the Arsenal, the Arsenal's participation in the ARMS program and the presence of private companies within "Building 220" throw federal jurisdiction into doubt. Of course, any such doubts regarding the United States' exclusive jurisdiction must be resolved in favor of remand. *See Palisades Collections LLC*, 552 F.3d at 336.[11]

In sum, Defendants have not shown that the Arsenal—or, more specifically, "Building 220"—was a federal enclave at a time period relevant to the events alleged by Meadows. Defendants ask this Court to conclude that Meadows' claims arose on a federal enclave because of the jurisdictional status of the Arsenal—or, more specifically, "Building 220"—between 1942 and 2002, when *Adams*, *supra*, was decided but not at any time relevant to this action. Defendants, presumably, would have Meadows prove otherwise. But to require such a showing by Meadows would obviate Defendants' burden of proving federal subject-matter jurisdiction in this matter,

---

[11] In the alternative, this Court should stay any ruling regarding the Arsenal's status as a federal enclave until Meadows has had sufficient time to conduct discovery regarding any sale or lease of any part of the Arsenal, which may require the issuing of third-party subpoenas.

13

thereby turning federal law on its head. *See, e.g.*, *Cowling*, 321 F. Supp. 3d at 627 ("On a motion to remand, the burden of establishing federal subject-matter jurisdiction falls on the party seeking removal to the federal forum, which, in this case, is the Defendants."). This Court must reject that approach and, accordingly, remand this action to the Montgomery County Circuit Court, where it originated and belongs.

### III. Even if the Arsenal is a Federal Enclave, Meadows Claims Did Not Arise Within the Enclave; Therefore, His Claims Did Not Rise Under Federal Law

For the reasons discussed in Section II, *supra*, Defendants have not established that the Arsenal—or, more specifically, "Building 220"—was a federal enclave during the time period relevant to this action. Even if they had, however, it does not follow that Meadows' claims, which are at best tangentially related to the Arsenal, are subject to federal jurisdiction. Rather, removal is only proper if Meadows' claims *arose* in the Arsenal, as "a case arises under federal law when federal law creates the cause of action asserted." *Flying Pigs, LLC*, 757 F.3d at 181. Defendants brush aside this important jurisdictional matter by asserting that it "is undisputed that Meadows' claims against BAE arise out of the federal enclave." (Notice of Removal, ECF No.1, ¶ 15). That assertion, however, is far from undisputed; it is simply wrong.

The "[f]ederal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising on [federal enclaves]." *Allison*, 689 F.3d at 1235. Thus, whether Meadows' claims arose in the Arsenal is a choice of law question, in essence, whether the federalized law of the enclave or the law of the Commonwealth of Virginia applies. In conducting this inquiry, this Court must refer to Virginia's choice of law rules because it is situated in Virginia. *See, e.g.*, *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599 (4th Cir. 2004) (observing that federal courts apply the forum state's choice of law rules). In determining what law applies to a given cause of action, Virginia "adhere[s] to the *lex loci delicti*, or place of the

14

wrong, standard." *Jones v. R. S. Jones & Assocs.*, 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993).

"According to the settled rule, 'the *lex loci* will govern as to all matters going to the basis of the right of action itself . . . .'" *Id.* (quoting *Maryland v. Coard*, 175 Va. 571, 580–81, 9 S.E.2d 454, 458 (1940)).[12]

Defendants appear to take the position that because Meadows, at times, worked on site at the Arsenal for Defendant BAE, in "Building 220," his claims necessarily arose in a federal enclave and thereby became subject to federal jurisdiction. But, as courts have recognized, "[d]etermining where a given claim 'arose' in the context of federal enclave jurisdiction depends upon the nature of the specific claim at issue." *Cramer v. Logistics Co.*, 2015 U.S. Dist. LEXIS 4168, *5 (W.D. Tex. Jan. 14, 2015). Accordingly, Meadows' claims must be considered separately, in light of Virginia's choice of law rules, to determine whether they "arose" in the Arsenal. When Meadows' allegations are considered in this manner, it is evident that his claims did not arise in the Arsenal and thus did not arise under the laws of the United States as "federalized" state law claims. Consequently, this Court lacks subject-matter jurisdiction and, in keeping with its obligation under 28 U.S.C. § 1447, must remand this action to the Montgomery County Circuit Court, where it originated and belongs.

---

[12] This conclusion follows regardless of whether the Arsenal is a federal enclave or not, because it is well established that "state laws that existed at the time that the enclave was ceded to the federal government remain in force." *Allison*, 689 F.3d at 1237. Indeed, Defendants rely upon that attribute of federal enclaves in their respective Motions to Dismiss. (*See generally* ECF Nos. 4 and 6). Virginia's choice of law rules were established long before 1942, the date of the deeds ceding at least parts of the Arsenal to the United States government. *See, e.g.*, *Maryland*, 175 Va. at 580–81, 9 S.E.2d at 458; *Flowers v. Virginian R. Co.*, 135 Va. 367, 373, 116 S.E. 672, 674 (1923) ("The accident having occurred in West Virginia, the substantive law of that State is controlling. This proposition is conceded by counsel on both sides and is well settled."). Thus, even if this Court were to adopt the "federalized" choice of law rules of the Arsenal (assuming it is a federal enclave), the *lex loci delicti* standard would still apply.

15

### A. Meadows' Claims for Defamation and Defamation *Per Se* Did Not Arise in the Arsenal

Counts I and II of Meadows' Amended Complaint are for defamation and defamation *per se*, respectively.[13] As noted above, the "[f]ederal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising on [federal enclaves]," *Allison*, 689 F.3d at 1235, and whether this Court adopts the choice of law rules of the forum state (as Meadows maintains it should) or the Arsenal (assuming it is a federal enclave), the applicable law is that of the "*lex loci delicti*, or place of the wrong." *Jones*, 246 Va. at 5, 431 S.E.2d at 34. "In defamation actions, the place of the harm has traditionally been considered to be the place where the defamatory statement was published, *i.e.*, seen or heard by non-parties." *Wells v. Liddy*, 186 F.3d 505, 521-522 (4th Cir. 1999). "With respect to defamation claims involving email, the place of publication is deemed to be the place where the email was received (*i.e.*, opened and read)." *Galustian v. Peter*, 561 F. Supp. 2d 559, 565 (E.D. Va. 2008); *see also Edwards v. Schwartz*, No. 7:18-cv-378, 2019 U.S. Dist. LEXIS 45553, at *64 (W.D. Va. Mar. 19, 2019) ("In defamation cases, Virginia courts apply the substantive law of the state where the defamatory statements were first published. . . . When the alleged defamation is executed via email correspondence, the place of publication is dictated by the place where the email was opened and read.") (citations omitted).

The bulk of Meadows' defamation claims arise from BAE's initial July 25, 2017, disclosure to the DOD. This was made to the DOD's Office of the Inspector General, located physically in Alexandria, Virginia.[14] Meadows also alleges that the statements made by BAE in

---

[13] Because the same analysis for the purposes of removal and remand applies to both claims, Meadows will discuss these claims together as defamation.

[14] *See Contact*, Department of Defense Office of Inspector General, https://www.dodig.mil/Contact/ (last accessed July 16, 2019).

follow-up email correspondence to the DON in August and December of 2017 were defamatory. These were sent via email to Michael J. Woods of the DON's Acquisition Integrity Office, located physically in Washington, D.C. (*See* Amended Complaint, Ex. E). There is obviously no federal question jurisdiction over state law claims arising in the Commonwealth itself. Likewise, there is no federal question jurisdiction over civil claims arising under the laws of Washington, D.C. *See, e.g.*, *United States v. Perez*, 488 F.2d 1057, 1059 n.3 (4th Cir. 1974) (observing that the Court Reorganization Act, 28 U.S.C. § 1363, "divest[ed] federal district courts of jurisdiction over local civil matters in the District of Columbia, *e.g.*, under 28 U.S.C. § 1331, the general federal question jurisdictional provision"); *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 736 (D. Md. 2017) ("Congress has specified, however, that 'laws applicable exclusively to the District of Columbia' do not constitute 'laws of the United States' for purposes of § 1331 jurisdiction.").

Although it cannot be said with one-hundred percent certainty, it is probable that these defamatory statements were published in Alexandria, Virginia, and Washington, D.C., respectively. *Cf. Edward*, 2019 U.S. Dist. LEXIS 45553, at *65 ("Here, because Virginia is where Virginia Tech maintains its principal place of business, and because the email containing the Letter was sent to a Virginia Tech administrator, it is . . . 'probable' that publication occurred in Virginia. Therefore, this court applies the relevant Virginia law governing defamation."). In any event, it is certain that none of BAE's statements to the DOD or DON were published, made, opened, or received at the Arsenal, the only federal enclave alleged by Defendants.

In sum, Meadows' defamation claims did not arise under the purported "federalized" law of the Arsenal—or, for that matter, under any federal law at all. Therefore, this Court lacks subject-matter jurisdiction over Meadows' defamation claims and must remand this action to the Montgomery County Circuit Court. To the extent this Court finds that it has subject-matter

jurisdiction over any of Meadows' other claims, this Court must sever Meadows' claims for defamation and remand those claims to the Montgomery County Circuit Court, pursuant to 28 U.S.C. § 1441(c).(2).

### B. Meadows' Claim for Wrongful Discharge Did Not Arise in the Arsenal

Count III of Meadows' Amended Complaint is for wrongful discharge, a cause of action in Virginia recognized by *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985). As noted above, the "[f]ederal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising on [federal enclaves]," *Allison*, 689 F.3d at 1235, and whether this Court adopts the choice of law rules of the forum state (as Meadows maintains it should) or the Arsenal (assuming it is a federal enclave), the applicable law is that of the "*lex loci delicti*, or place of the wrong." *Jones*, 246 Va. at 5, 431 S.E.2d at 34. "The place of the wrong for purposes of this rule is the 'place where the last event necessary to make an actor liable for an alleged tort takes place.'" *Hagan v. Feld Entm't, Inc.*, 365 F. Supp. 2d 700, 707 (E.D. Va. 2005) (quoting *Insteel Indus. v. Costanza Contracting,* 276 F. Supp. 2d 479, 486 (E.D. Va. 2003)). With respect to wrongful discharge, the last event necessary is the discharge itself. *See id.* ("Plaintiff was discharged from his employment with Feld while in California. . . . [T]hus, the wrong occurred in California and the proper substantive law to apply to that claim is California law.").; *accord Aiken v. Emp'r Health Servs.*, No. 95-3196, 1996 U.S. App. LEXIS 6060, at *7 (10th Cir. Mar. 26, 1996) (holding, in a wrongful discharge action, that because the plaintiff received his termination notice "at a clinic in Missouri," the place of the wrong was Missouri and thus Missouri law applied as to that claim).[15]

---

[15] *Aiken* was appealed from a district court sitting in Kansas; therefore, the Tenth Circuit applied Kansas' choice of law rule, which "follows the *lex loci delicti* approach of the First Restatement, which means the law of the 'place of the wrong' controls." *Id.*

18

BAE (the defendant against whom this claim is asserted) discharged Meadows on June 23, 2017, by a letter that he received at his home in Montgomery County, Virginia, ostensibly for Meadows' purported violation of BAE's conflict of interest disclosure policy and purported violation of BAE's timekeeping policy. These were, in reality, mere pretexts, as BAE only fired Meadows after he continually refused to engage in corporate espionage against his other employer (whom he had disclosed to BAE), Orbital ATK. It is here, at his home in Montgomery County, Virginia—unquestionably *not* a federal enclave—where Meadows was discharged, as it is the place where he received notice of his discharge, the last event necessary to complete the tort of wrongful discharge. *See, e.g.*, *Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998) ("The wrong in this case, the injury of which Milton complains, is his discharge. This injury unquestionably occurred in Maryland, where Milton had his office and *where his dismissal was communicated to him*." (emphasis added)); *cf. Stuckstede v. NJVC LLC*, No. 4:09CV0663 JCH, 2009 U.S. Dist. LEXIS 103578, at *5-8 (E.D. Mo. Nov. 5, 2009) (rejecting plaintiff's argument that wrongful discharge action arose at his home where he received a discharge letter because the plaintiff did "not allege in his Complaint that his discharge occurred at his home").

Defendants' Notice of Removal cites California cases for a contrary proposition—that it is where the employee was employed, not where he or she was discharged, that determines where a claim for wrongful discharge arises. *See, e.g.*, *Powell v. Tessada & Assocs.*, 2005 U.S. Dist. LEXIS 46922, at *7 (N.D. Cal. 2005).; *Lockhart v. MVM, Inc.*, 175 Cal. App. 4th 1452, 97 Cal.Rptr.3d 206, 212 (Ct. App.2d Dist. Cal. 2009).; *Taylor v. Lockheed Martin Corp.*, 78 Cal.App.4th 472, 481, 92 Cal. Rptr. 2d 873 (Ct. App.2d Cal. Dist. 2000). These cases are not only distinguishable, but simply have no application to a federal court applying the law of Virginia (which, with respect to choice of law rules, is identical to that of the purported enclave, the Arsenal).

19

In *Taylor*, the plaintiff was on paid suspension when he was discharged, and argued that his wrongful discharge claim therefore arose outside the enclave. The Court of Appeal of California rejected this argument (which was raised for the first time on appeal), but its analysis offers little insight into the court's reasoning. The court merely observed: "The fortuity of a paid suspension before his discharge does not mean that [the plaintiff] ever worked for Lockheed outside the enclave or that his employment claims arose elsewhere." 78 Cal.App.4th 472, 481, 92 Cal. Rptr. 2d 873. *Powell* and *Lockhart*, *supra*, simply followed *Taylor*'s holding.

The holdings of these cases, however, may be explained by reference to California's choice of law rules, which are significantly different than Virginia's. Unlike the *lex loci delicti* standard, which has a fairly straightforward application, "California follows a three-step 'governmental interest analysis' to address conflict of laws claims," in which (1) the court determines whether the laws of the different jurisdictions are "materially different"; (2) if so, the court "determine[s] what interest, if any, each [jurisdiction] has in having its own law applied to the case"; and (3) if the interests are equal, "the court take[s] the final step and select[s] the law of the [jurisdiction] whose interests would be 'more impaired' if its law were not applied." *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 919-20, 103 Cal. Rptr. 2d 320, 330-31, 15 P.3d 1071, 1080-81 (2001). As the place of wrong is of little-to-no relevance to California's choice of law analysis, it is unsurprising that the *Taylor*, *Powell*, and *Lockhart* courts gave little weight to *where* the plaintiff was discharged in determining where the plaintiff's claims arose. By contrast, in Virginia, the place where the plaintiff was discharged—the last event necessary for a claim of wrongful discharge—begins and ends the analysis.

In sum, because the place of wrong—the *lex loci delicti*—was not the Arsenal, Meadows' claim for wrongful discharge did not arise in the Arsenal and thus did not arise under federal law.

Consequently, this Court lacks subject-matter jurisdiction over Meadows' claim for wrongful discharge. To the extent this Court finds that it has subject-matter jurisdiction over any of Meadows' other claims, this Court must sever Meadows' claim for wrongful discharge and remand this claim to the Montgomery County Circuit Court, pursuant to 28 U.S.C. § 1441(c)(2).

### C.    Meadows' Claims for Common Law Conspiracy and Business Conspiracy Did Not Arise in the Arsenal

Counts IV and V of Meadows' Amended Complaint are for common law conspiracy and business conspiracy pursuant to Virginia Code § 18.2-500.[16] As noted above, the "[f]ederal enclave doctrine operates as a choice of law doctrine that dictates which law applies to causes of action arising on [federal enclaves]," *Allison*, 689 F.3d at 1235, and whether this Court adopts the choice of law rules of the forum state (as Meadows maintains it should) or the Arsenal (assuming it is a federal enclave), the applicable law is that of the "*lex loci delicti*, or place of the wrong." *Jones*, 246 Va. at 5, 431 S.E.2d at 34. "The place of the wrong for purposes of this rule is the 'place where the last event necessary to make an actor liable for an alleged tort takes place.'" *Hagan*, 365 F. Supp. 2d AT 707 (E.D. Va. 2005) (quoting *Insteel Indus.,* 276 F. Supp. 2d at 486). "When determining what [jurisdiction's] law is dictated by *lex loci delicti* with respect to conspiracy, the place of the wrong is the place of the first causally-related injury because the first legal injury produced by an alleged business conspiracy is the last act necessary for liability." *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.,* Civil Action No. 3:05cv355, 2006 U.S. Dist. LEXIS 96056, at *19-20 (E.D. Va. Feb. 10, 2006), *aff'd*, 2007 U.S. App. LEXIS 9332 (4th Cir. Apr. 24, 2007).

---

[16] Because the same analysis for the purposes of removal and remand applies to both claims, Meadows will discuss these claims together as conspiracy.

21

BAE and Orbital ATK conspired to discharge Meadows from his respective employment with each company on false "conflict of interest" grounds. (*See* Amended Complaint ¶ 175). These false grounds later served, in part, as the basis for BAE's defamatory communications to the DOD and DON. The injuries that Meadows suffered as a result of this conspiracy, including those to his reputation, trade, business, or profession, clearly occurred outside the Arsenal because, by the time Meadows was injured, he was no longer maintaining any physical presence at the Arsenal at all. Furthermore, the conspiracy involved BAE and Orbital ATK acting in concert, and Meadows was never employed by Orbital ATK at the Arsenal; thus, none of Orbital ATK's actions took place within the purported federal enclave. Accordingly, Meadows' claims for conspiracy did not arise in the Arsenal and thus did not arise under federal law. Consequently, this Court lacks subject-matter jurisdiction over Meadows' claim for wrongful discharge. To the extent this Court finds that it has subject-matter jurisdiction over any of Meadows' other claims, this Court must sever Meadows' claims for conspiracy and remand those claims to the Montgomery County Circuit Court, pursuant to 28 U.S.C. § 1441(c)(2).

### IV.    Remand is Required Because this Court Lacks subject-matter jurisdiction

As the foregoing demonstrates, Defendants' Notice of Removal does not adequately prove that the Arsenal—or, more specifically, "Building 220"— is a federal enclave. Even if this Court were to accept that the Arsenal is a federal enclave, Meadows' claims are, at best, *only tangentially related* to the Arsenal; they did not *arise* there and thus did not arise under federal law. The inescapable conclusion that follows is that this Court lacks subject-matter jurisdiction under 28 U.S.C. § 1331.[17] Accordingly, this Court must remand this action back to the Montgomery County

---

[17] Nor does this Court have subject-matter jurisdiction under 28 U.S.C. § 1332 (diversity), a position which, rightfully, Defendants do not take.

Circuit Court from whence it was removed. *See* 28 U.S.C. § 1447 (""If at any time before final judgment it appears that the district court lacks subject-matter jurisdiction, the case shall be remanded."). To the extent this Court finds that one or more of Meadows' claims are subject to federal subject-matter jurisdiction, but that one or more of Meadows' claims are *not* subject to federal subject-matter jurisdiction, this Court must sever and remand those claims pursuant to 28 U.S.C. § 1441(c)(2).

## **CONCLUSION**

For the foregoing reasons, Plaintiff Jeffrey S. Meadows respectfully requests that this Court grant his Motion to Remand, remand this action to the Montgomery County Circuit Court, award reasonable costs and legal fees, and order such other and further relief as the Court deems proper.

Respectfully submitted,

JEFFREY S. MEADOWS

By: /s/Daniel J. Martin_____
 Of Counsel

John R. Thomas, Jr. (VSB #75510)
Hafemann Magee & Thomas, LLC
11 Franklin Road, SW
P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660 (telephone)
(843) 645-6530 (facsimile)
jt@fed-lit.com

John P. Fishwick, Jr. (VSB #23285)
Monica L. Mroz (VSB #65766)
Carrol M. Ching, Esquire (VSB #68031)
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 (telephone)
(540) 345-5789 (facsimile)
John.fishwick@fishwickandassociates.com

23

Monica.mroz@fishwickandassociates.com
Carrol.Ching@fishwickandassociates.com
Daniel.martin@fishwickandassociates.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By: /s/Daniel J. Martin
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 (telephone)
(540) 345-5789 (facsimile)
Daniel.martin@fishwickandassociates.com

24