# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| JEFFREY S. MEADOWS | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| NORTHROP GRUMMAN INNOVATION SYSTEMS, INC., | ) |
| | ) Civil Action No. 7:19-cv-00394 |
| BAE SYSTEMS, INC., | ) |
| | ) |
| and | ) |
| | ) |
| BAE SYSTEMS ORDNANCE SYSTEMS, INC., | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT BAE SYSTEMS, INC.'S AND BAE SYSTEMS ORDNANCE SYSTEMS, INC.'S MOTION TO DISMISS**

COMES NOW, Jeffrey S. Meadows ("Meadows"), by counsel, and files this Memorandum in Opposition to Defendant BAE Systems, Inc.'s and BAE Systems Ordnance Systems, Inc.'s Motion to Dismiss ("Motion"). Defendants BAE Systems, Inc. and BAE Systems Ordnance Systems, Inc. (collectively, "BAE"), having removed this action from the Montgomery County Circuit Court to this Court (*See* Notice of Removal, ECF No. 1), have also moved to dismiss Meadows' Amended Complaint (*See* Motion, ECF No. 5). BAE asserts that dismissal is required pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, on a number of purported grounds. For the reasons that follow, BAE's Motion should be denied in its entirety.

### FACTS AND PROCEDURAL HISTORY

This is an action for defamation, defamation *per se*, wrongful discharge, common law conspiracy, and business conspiracy under Virginia Code § 18.2-500, related to Meadows'

1

employment history with Defendants[1] and Defendants' improper actions following their near-simultaneous discharge of Meadows' employment with BAE and Orbital ATK, Inc. ("Orbital ATK"), Defendant Northrup Grumman Innovation Systems, Inc.'s ("NGIS"). predecessor in interest. The facts of this case are fully alleged in Meadows' Amended Complaint[2] and summarized herein.

In 2007, Meadows began working for Orbital ATK. (*See* Amended Complaint ¶ 10). As an Orbital ATK employee, Meadows worked on, among other things, proposals related to the operation, management, and modernization of facilities, and in various locations, including Virginia, Australia, and Utah. (*Id.* at ¶¶ 11–13). Orbital ATK also allowed Meadows to work remotely from his home in Montgomery County, Virginia, in exchange for remaining at Orbital ATK when Meadows had desired to accept a job with BAE. (*Id.* at ¶¶ 17–20). Later, however, Meadows decided to take a job with BAE, and informed both BAE and Orbital ATK of his impending dual employment. (*Id.* at ¶¶ 24–26). As a BAE employee, Meadows either worked on site at the Radford Army Ammunition Plant ("Arsenal") or remotely from his home in Montgomery County, Virginia. (*Id.* at ¶ 28).

Independent of Meadows' disclosures to BAE and Orbital ATK, BAE knew that Meadows also worked for Orbital ATK because, on more than one occasion, Meadows' supervisors at BAE asked Meadows to provide confidential, proprietary Orbital ATK information for BAE's own benefit. (*See id.* at ¶¶ 39–52). For example, in 2016, Meadows' supervisor at BAE, Michael Bate, asked Meadows to provide an Orbital ATK acid facility modernization proposal, which Meadows

---

[1] As explained herein, Meadows was employed by Defendant BAE Systems, Inc. through its subsidiary, BAE Systems Ordnance Systems, Inc., and by Orbital ATK, Inc., the predecessor in interest of Defendant Northrup Grumman Innovation Systems, Inc.

[2] The Amended Complaint is attached to Defendants' Notice of Removal. (*See* ECF No. 1, Ex. A.).

2

refused to do, a clear indication that BAE knew that Meadows was simultaneously employed by Orbital ATK. (*Id.* at ¶¶ 41-42).

Despite this prior knowledge, BAE discharged Meadows on June 23, 2017, by a letter that Meadows received at his home in Montgomery County, Virginia, ostensibly for Meadows' purported violation of BAE's conflict of interest disclosure policy; the other ostensible reason was Meadows' purported violation of BAE's timekeeping policy. (*Id.* at ¶ 56; Ex. B). This discharge was preceded by Meadows' being escorted out of the Arsenal, without explanation, on May 1, 2017, and BAE temporarily suspending Meadows. (*Id.* at ¶¶ 53–54).

BAE's discharge of Meadows was precipitated by Orbital ATK reporting to BAE that Meadows had accepted a new, full-time position with Consolidated Nuclear Security, LLC ("CNS"), a company affiliated with Orbital ATK. (*Id.* at ¶¶ 63–65). In fact, although Meadows was considering that position, he ultimately did not accept it, motivating Orbital ATK to retaliate against Meadows by informing BAE that he had. (*Id.*). In this way, Orbital ATK conspired with BAE to have Meadows wrongfully discharged. BAE, however, had additional, independent motives to discharge Meadows, particularly Meadows' failure to provide BAE with confidential, proprietary Orbital ATK documents. (*See id.* at ¶¶ 39–52, 160, 164).

Defendants' improper actions did not end with Meadows' discharge, however. On July 25, 2017, BAE notified the Office of Inspector General of the Department of Defense ("DOD"), on its own initiative, alleging that Meadows was employed by Orbital ATK while working for BAE without BAE's knowledge or permission, and that Meadows had mischarged his time related to "non-work activities" while employed by BAE. (*Id.* at ¶ 71). Contrary to BAE's characterization,[3] this was not a *mandatory disclosure* because the allegations were false and a mere pretense for

---

[3] (*See, e.g.*, Notice of Removal, ECF No. 1, at ¶ 9).

BAE's discharge of Meadows as retaliation for his failure to provide BAE with confidential, proprietary Orbital ATK documents. Indeed, BAE's communications to the DOD and Department of Navy ("DON"). included several misrepresentations. (*See id.* at ¶¶ 78–83; Ex. E). Ultimately, the DON determined that the evidence did not support BAE's allegations. (*Id.* at ¶ 87; Ex. G).

Based on these facts, and others alleged in the Amended Complaint, Meadows filed his Complaint in the Montgomery County Circuit Court for defamation, defamation *per se*, wrongful discharge, common law conspiracy, and business conspiracy under Virginia Code § 18.2-500, all claims arising under Virginia law, on May 11, 2018. Prior to serving Defendants, Meadows amended his Complaint and filed his Amended Complaint in the Montgomery County Circuit Court on April 24, 2019. Subsequently, BAE filed, and NGIS consented to, a Notice of Removal,[4] thereby removing this action from the Montgomery County Circuit Court to this Court. That same day, BAE filed its Motion to Dismiss (ECF No. 5) and Memorandum in Support (ECF No. 6).

---

[4] Attached to Defendants' Notice of Removal as Exhibit B is the Declaration of Matt Linkous. (*See* ECF No.1-2). Such declarations are permitted pursuant to 28 U.S.C. § 1746. However, that statute provides that such declarations *must* be dated. *See id.* (" . . . [S]uch matter may . . . be supported . . by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."). The Declaration of Matt Linkous, however, does not contain the "Executed on: (date)" language required by 28 U.S.C. § 1746. Accordingly, this Court should not consider the Declaration of Matt Linkous in ruling upon Meadows' Motion to Remand, Defendants' respective Motions to Dismiss (ECF Nos. 3 and 5), or any other matter. *See, e.g.*, *Rivera v. Allstate Ins. Co.*, 140 F. Supp. 3d 722, 729 (N.D. Ill. 2015) ("The consequence of the Rivera and Scheuneman declarations being undated. . . is that the declarations are not evidence and thus will be disregarded on summary judgment."); *Globalaw Ltd. v. Carmon & Carmon Law Office & Globalaw, Inc.*, 452 F. Supp. 2d 1, 28 n.11 (D.D.C. 2006) (noting that an undated affidavit was "in violation of 28 U.S.C. § 1746"); *Orr v. Orbis Corp.*, No. 1:07-CV-2653-TWT-SSC, 2010 U.S. Dist. LEXIS 86990, at *8 (N.D. Ga. July 30, 2010) ("Because the Simmons and Watson Declarations are not dated or signed, the court will not consider them in addressing Defendants' motion or Plaintiff's response . . . .").

4

## ARGUMENT[5]

At the outset, Meadows must reassert that, for the reasons articulated in his contemporaneously filed Motion to Remand and Memorandum in Support thereof, this Court lacks subject-matter jurisdiction over this action, and must therefore remand this action back to the Montgomery County Circuit Court from whence it was removed. It necessarily follows that this Court cannot consider BAE's Motion to Dismiss or any of the legal arguments presented therein. Given the uncommon procedural posture of this case, however, Meadows has agreed to submit his response to BAE's Motion to Dismiss together with his Motion to Remand, so that this Court may address any overlapping issues efficiently in the event it denies Meadows' Motion to Remand. Thus, the arguments presented below assume, for the purposes of this Memorandum only, that this Court possesses subject-matter jurisdiction over this action.

BAE's Motion to Dismiss advances a number of arguments, none of which are meritorious:

First, BAE asserts that it is immune from liability for *all* claims because it is entitled to "derivative sovereign immunity"[6] due to its status as a government contractor. BAE, however,

---

[5] BAE has joined in and incorporated by reference Defendant NGIS's Motion to Dismiss (ECF No. 3) and Memorandum in Support thereof (ECF No. 4). To the extent this requires a response from Meadows, Meadows relies upon the arguments and authorities presented in his contemporaneously filed Memorandum in Opposition to Defendant Northrop Grumman Innovation Systems, Inc.'s Motion to Dismiss.

[6] So-called "derivative sovereign immunity" stems from the Supreme Court's decision in *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940), a case which held that agents of the United States are also sometimes protected from liability for carrying out its will. *See Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 643 (4th Cir. 2018) (discussing *Yearsley*). However, the Supreme Court has never called the doctrine it developed in *Yearsley* "derivative sovereign immunity"; indeed, even in its most recent decision affirming the *Yearsley* doctrine, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016), the Supreme Court did not adopt the phrase for itself, but only referenced its use by the parties and the lower court. *See also Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) (noting that *Yearsley* "does not address sovereign immunity"). While for the purposes of this Memorandum Meadows will refer to this doctrine as "derivative sovereign immunity," as BAE has, the use of this label has no

extends the doctrine of derivative sovereign immunity beyond its proper scope, as none of BAE's tortious activities were done at the instruction of the federal government. Granting BAE derivative sovereign immunity under the circumstances alleged by Meadows would essentially grant that doctrine's protection to *any* conduct of *any* government contractor, even if only tangentially related to the contractor's work for the United States. Accordingly, this argument must be rejected.

Second, BAE asserts that Meadows' claims for wrongful discharge and business conspiracy are not cognizable under the federal enclave doctrine. Under the federal enclave doctrine, certain land ceded by one of the several States to the United States becomes subject to exclusive federal jurisdiction. Here, and in the Notice of Removal, BAE contends that the Arsenal in Radford, Virginia, is a federal enclave, and that because Meadows' employment with BAE required Meadows, at times, to work at the Arsenal, all of his claims are subject to exclusive federal jurisdiction, despite the fact that Meadows' Amended Complaint, on its face, brings claims under Virginia law. This argument fails, as an initial matter, because BAE has not shown that the Arsenal or, more specifically, "Building 220," where Meadows worked while on site at the Arsenal,[7] is a federal enclave. More importantly, BAE has not shown that Meadows' claims for wrongful discharge and business conspiracy arose in the Arsenal at all.

Third, BAE argues that Meadows' allegations do not satisfy the elements for wrongful discharge as articulated by the Supreme Court of Virginia in *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985). On the contrary, Meadows' claim for wrongful discharge is

---

bearing on Meadows' position that so-called "derivative sovereign immunity" is not akin to the jurisdictional doctrine of sovereign immunity.

[7] BAE essentially argues that certain of Meadows' claims arose in a federal enclave because of Meadows' work-related activities in "Building 220" of the Arsenal. (*See* Notice of Removal, ECF No. 1). Thus, the only relevant question for the purposes of this action is whether "Building 220" of the Arsenal is located on a federal enclave.

the exemplary *Bowman* case. BAE's termination of Meadows' employment for Meadows' refusal to engage in unlawful acts amounting to corporate espionage was in clear violation of the Commonwealth of Virginia's laws and public policy. Therefore, this argument also fails.

Fourth, and finally, BAE argues that Meadows' conspiracy claims are not sufficiently pled. With respect to common law conspiracy, BAE claims that Meadows has failed to plead underlying tortuous or unlawful actions and an agreement to conspire. With respect to business conspiracy, BAE asserts that Virginia Code § 18.2-499 does not apply to the injuries alleged by Meadows. These arguments fail, however, because (1) BAE and Orbital ATK[8] engaged in tortuous acts, namely, those alleged in the other counts of the Amended Complaint; (2) the facts pled by Meadows demonstrate coordinated, not merely "parallel," actions on the part of BAE and Orbital ATK; and (3) the plain language of Virginia Code §§ 18.2-499 and 18.2-500 provide a remedy for the injuries suffered by Meadows.

Accordingly, BAE's Motion to Dismiss should be denied in its entirety.

## I. Legal Standard Under Rules 12(b)(1) and 12(b)(6)

BAE brings its Motion to Dismiss under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to seek dismissal based on the court's lack of subject-matter jurisdiction over the action. "When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject-matter jurisdiction, the burden of proving subject-matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Generally, "[w]hen considering a Rule 12(b)(1) motion to dismiss, a court assumes that all *factual* allegations in the complaint are

---

[8] Recall that Orbital ATK is the predecessor in interest to Defendant NGIS.

true." *Falwell v. City of Lynchburg*, 198 F. Supp. 2d 765, 771-72 (W.D. Va. 2002). But "in some instances, if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own. . . . If satisfaction of an essential element of a claim is at issue, however, the jury is the proper trier of contested facts." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) ("***Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute***,' the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)) (emphasis added)). Still, even when the Court "may consider evidence outside the pleadings," the Court may consider the plaintiff's allegations as "evidence on the issue." *Id.* When it does so, "[t]he district court should apply the standard applicable to a motion for summary judgment," and the "moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

On the other hand, a Rule 12(b)(6) motion tests the legal sufficiency of the complaint, *see Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008), and should be denied unless it appears that plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *See De Sole v. United States,* 947 F.2d 1169, 1177 (4th Cir. 1991); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). A court reviewing a complaint on a Rule 12(b)(6) motion must assume the veracity of well-pleaded allegations and must construe factual allegations in favor of plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). A court must also mind the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. To survive

a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## II. BAE Has Not Established That the Arsenal is a Federal Enclave; Even if the Arsenal is a Federal Enclave, Meadows' Claims Did Not Arise Therein

Meadows addresses the related issues of (1) whether the Arsenal is a federal enclave and (2) whether Meadows claims arose in the Arsenal in his contemptuously filed Motion to Remand and Memorandum in Support thereof. Meadows incorporates by reference the arguments and authorities set forth in his contemptuously filed Motion to Remand and Memorandum in Support thereof as if fully set forth in this Memorandum.

## III. BAE Cannot Avoid Liability Under the Doctrine of Derivative Sovereign Immunity

BAE asserts that it is immune from liability for *all* claims because it is entitled to derivative sovereign immunity due to its status as a government contractor. With respect to this argument, BAE purports to bring its Motion to Dismiss under Rules 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject-matter jurisdiction.[9] In other words, BAE argues that its purported

---

[9] BAE's contention that Meadows must prove subject-matter jurisdiction should strike this Court as odd, given that Meadows' has contemporaneously filed his Motion to Remand, arguing specifically that this Court *does not* have subject-matter jurisdiction because Meadows brings claims under Virginia law. It appears as if BAE wants to have its cake and eat it too, asserting that this Court has subject-matter jurisdiction in its Notice of Removal (ECF No. 1, at ¶ 12), while at the same time asserting that this Court does not have subject-matter jurisdiction in its Motion to Dismiss. Meadows recognizes that the doctrines of federal enclaves and derivative sovereign immunity are not to be conflated. Nevertheless, the ultimate issue— subject-matter jurisdiction— remains the same, and "[i]t is fundamental to the law that parties cannot take inconsistent positions on the same basic issues." *Brainware, Inc. v. Scan-Optics, Ltd.*, Civil Action No. 3:11cv755, 2012 U.S. Dist. LEXIS 116009, at *12 (E.D. Va. Aug. 16, 2012). Accordingly,

derivative sovereign immunity is a jurisdictional matter, rather than a defense as to its liability.

Meadows acknowledges that there is Fourth Circuit precedent for the proposition that derivative sovereign immunity is a jurisdictional matter. *See Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 649 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 417, 2018 U.S. LEXIS 6423 (Oct. 29, 2018). However, as discussed further below, the Supreme Court of the United States has never directly addressed whether derivative sovereign immunity is a jurisdictional matter; *Cunningham* merely added to a circuit split on the issue. Furthermore, the Supreme Court cases of *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18, 20-21 (1940), and its progeny, *see, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), which created and expanded upon the doctrine of derivative sovereign immunity, support the "defense" as opposed to "jurisdictional" view of derivative sovereign immunity.

Ultimately, however, whether BAE's assertion of derivative sovereign immunity is jurisdictional or viewed as a defense does not change the outcome—that BAE cannot avoid liability for Meadows' claims through derivative sovereign immunity. That is because, even if derivative sovereign immunity is jurisdictional and properly brought under a 12(b)(1) Motion, the jurisdictional facts are so intertwined with Meadows' allegations that this Court must construe Meadows' allegations as true and not look outside the pleadings. *See, e.g.*, *Jadhav*, 555 F.3d at 348 ("***Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute*****,'** the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." (quoting *Adams*, 697 F.2d at 1219) (emphasis added)). Moreover, even if this Court looks outside

---

Meadows would make his position clear: he disputes both this Court's subject-matter jurisdiction and BAE's reliance on derivative sovereign immunity to shield itself from liability.

10

the pleadings, it may still view Meadows' allegations as evidence. *See Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768, *supra*. BAE, on the other hand, has not provided or even referenced any evidence in support of its refutation of Meadows' allegations. Thus, considering all the evidence available to the Court at this early, pre-discovery stage, nothing supports BAE's assertion of derivative sovereign immunity and BAE's Motion to Dismiss must be denied with respect to that issue.

Alternatively, should this Court rule against Meadows with respect to the issue of BAE's derivative sovereign immunity, this Court should allow the parties to engage in limited jurisdictional discovery so that Meadows may fully and fairly contest BAE's assertion. *See Cunningham*, 888 F.3d at 650-51 (recognizing that "discovery may be appropriate before granting a Rule 12(b)(1) motion to dismiss on this basis and noting that the district court allowed the parties to participate "in 75 days of limited discovery on the applicability of *Yearsley*").

### A. Derivative Sovereign Immunity is a Defense, Not a Jurisdictional Matter

"Under the concept of derivative sovereign immunity, stemming from the Supreme Court's decision in *Yearsley*, 309 U.S. at 20-21, agents of the sovereign are also sometimes protected from liability for carrying out the sovereign's will." *Cunningham*, 888 F.3d at 643. "[U]nder *Yearsley*, a government contractor is not subject to suit *if* (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power." *Metzgar v. KBR, Inc. (In re KBR, Inc.)*, 744 F.3d 326, 342 (4th Cir. 2014) (citing *Yearsley*, 309 U.S. at 20-21) (emphasis added).

In *Cunningham*, *supra*, the Fourth Circuit concluded for the first time "that the *Yearsley* doctrine operates as a jurisdictional bar to suit and not as a merits defense to liability." *Cunningham*, 888 F.3d at 650. This reading of *Yearsley*, however, is inconsistent with the *Yearsley*

decision itself, which does not once discuss "sovereign immunity." Rather, *Yearsley* discusses the *liability* of a government contractor, language associated with a defense on the merits as opposed to the jurisdictional doctrine of sovereign immunity. *See, e.g.*, *Yearsley*, 309 U.S. at 21 (noting that under certain circumstances "there is no liability on the part of the contractor for executing [the United States'] will"). Both the Fifth and Sixth Circuits have recognized this aspect of *Yearsley*. *See, e.g.*, *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) ("*Yearsley* immunity is . . . closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction."); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009) ("Based on the Supreme Court's actions in *Yearsley*, we hold that concluding *Yearsley* is applicable does not deny the court of subject-matter jurisdiction."). Accordingly, both the Fifth and Sixth Circuits properly treat an assertion of derivative sovereign immunity as akin to a merits defense, and analyze a motion to dismiss based on such an assertion under the Rule 12(b)(6) standard.

Tellingly, in even its most recent decision in the *Yearsley* line of cases, the Supreme Court has hesitated to use the phrase "derivative sovereign immunity," suggesting, at least, that the Court views the phrase "derivative sovereign immunity" as a mere label rather than speaking to the substance of the doctrine. *See generally Gomez*, 136 S. Ct. 663 (using "derivative sovereign immunity" or a similar phrase in only six instances, in quotation marks, and in reference to the parties' or the lower court's use of the phrase). Indeed, the Court in *Gomez* came close to outright rejecting the jurisdictional view of derivative sovereign immunity; though the petitioner in that case "assert[ed] 'derivative sovereign immunity,'" the Court rejected his argument, noting that there was "no authority for the notion that private persons performing Government work acquire the Government's embracive immunity." *Id.* at 672.

12

There is good reason to treat derivative sovereign immunity as a defense, brought properly under a 12(b)(6) Motion, rather than a jurisdictional issue, brought (as BAE has done here) under a 12(b)(1) Motion. Unlike "the blanket immunity enjoyed by the sovereign," *id.* at 666, the immunity of a government contractor like BAE is not absolute and is instead dependent on a number of factors, including whether the government authorized its actions, whether it violated the government's explicit instructions, and whether it violated federal law. *See id.* at 672; *Metzgar*, 744 F.3d at 342. Assessing a claim of derivative sovereign immunity thus requires a robust factual record from which the court can analyze the applicability of the doctrine to the particular defendant before it. Consequently, and in contrast to the purely legal doctrine of sovereign immunity, a court is ill-equipped to address derivative sovereign immunity at the earliest stages of litigation, which is typically when 12(b)(1) Motions are filed, as BAE has done here.

For the foregoing reasons, BAE's assertion of derivative sovereign immunity should be analyzed under the standards of Rule 12(b)(6), not Rule 12(b)(1). In other words, this Court "must assume the veracity of well-pleaded allegations and must construe factual allegations in favor of plaintiff," *Randall v. United States*, 30 F.3d at 522, in determining whether derivative sovereign immunity shields BAE from liability for the claims alleged by Meadows. So viewed, it is clear that BAE cannot benefit from derivative sovereign immunity in this action.

**B.**    **Even if Derivative Sovereign Immunity is a Jurisdictional Matter, Jurisdictional Facts Are Intertwined with the Merits of the Dispute; Therefore, this Court Must Accept Meadows' Allegations as True**

BAE maintains that derivative sovereign immunity is a jurisdictional matter properly brought under a Rule 12(b)(1) Motion to Dismiss. Therefore, BAE contends, this Court need not accept the truth of Meadows' allegations and may look to facts outside the pleadings, quoting *Mortensen v. First Fed. Sav. & Loan Assn*, 549 F.2d 884, 891 (3d Cir. 1977), for the proposition

13

that "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." But even if BAE's derivative sovereign immunity defense is properly raised by a Rule 12(b)(1) Motion to Dismiss, this Court must still accept the truth of Meadows' allegations because in this case the "jurisdictional facts are intertwined with the facts central to the merits of the dispute." *Jadhav*, 555 F.3d at 348.

As discussed in more detail below, BAE's assertion of derivative sovereign immunity turns on the falsity of Meadows' allegations. In other words, BAE's purported derivative sovereign immunity hinges on "the facts central to the merits" of Meadows' claims. When that is the case, as it is here, the Court must accept the plaintiff's allegations as true because to do otherwise would essentially rob the jury of its fact-finding function by improperly (and prematurely) resolving a factual dispute. As the Supreme Court observed in *Arbaugh*, *supra*, "[i]f satisfaction of an essential element of a claim is at issue . . . the jury is the proper trier of contested facts." 546 U.S. at 514.

Therefore, whether ruling upon BAE's Motion to Dismiss pursuant to Rule 12(b)(1) or 12(b)(6), this Court should accept Meadows' allegations as true and not consider evidence outside his pleadings.

## C. Derivative Sovereign Immunity Does Not Bar Any of Meadows' Claims Against BAE

"'[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States.' . . . That immunity, however, unlike the sovereign's, is not absolute." *Gomez*, 136 S. Ct. at 672 (quoting *Brady* v. *Roosevelt S. S. Co.*, 317 U.S. 575, 583, 63 S. Ct. 425, 87 L. Ed. 471 (1943)). Rather, "under *Yearsley*, a government contractor is not subject to suit *if* (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its

14

constitutional power." *Metzgar*, 744 F.3d at 342 (citing *Yearsley*, 309 U.S. at 20-21) (emphasis added). "[T]he contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.'" *Id.* at 345 (citing *Yearsley*, 309 U.S. at 22).

Meadows does not dispute that BAE is a government contractor, at least as relevant to this action. But that is not enough to confer upon it derivative sovereign immunity. *See Gomez*, 136 S. Ct. at 666 ("We hold that the petitioner's status as a Government contractor does not entitle it to "derivative sovereign immunity," *i.e.,* the blanket immunity enjoyed by the sovereign."). BAE does not seem to disagree with that basic notion; rather, it argues that all of its actions were undertaken pursuant to certain federal regulations applicable to it or otherwise at the direction of the federal government. Thus, BAE reasons, it is immune from liability.

BAE's position regarding its purported derivative sovereign immunity enlarges the doctrine beyond its proper scope. As demonstrated below, none of BAE's tortious activities were done at the instruction of the United States government. Granting BAE derivative sovereign immunity under the circumstances alleged by Meadows would essentially grant that doctrine's protection to *any* conduct of *any* government contractor, even if only tangentially related to the contractor's work for the United States government. Accordingly, this argument must be rejected.

### 1. Derivative Sovereign Immunity Does Not Bar Meadows' Claims of Defamation and Defamation *Per Se*

Counts I and II of Meadows' Amended Complaint are for defamation and defamation *per se*, respectively.[10] Meadows' defamation claims arise from (1) BAE's initial July 25, 2017,

---

[10] Because the same analysis for the purposes of BAE's Motion to Dismiss applies to both claims, Meadows will discuss these claims together as defamation.

15

disclosure to the DOD and (2) certain statements made by BAE in follow-up email correspondence to the DON in August and December of 2017. BAE contends that it is protected from any liability stemming from these communications, citing, among other cases, *Scharpenberg v. Carrington*, 686 F. Supp. 2d 655 (E.D. Va. 2010), for the proposition that government contractors cannot be held liable "for statements made in response to official government inquiries in a government procurement fraud investigation concerning their dealings with the government." *Id.* at 659 (citing *Mangold v. Analytic Services*, 77 F.3d 1442, 1444 (4th Cir. 1996).

The central flaw of BAE's argument is that the cases it cites in support of immunity, including the case it most heavily relies upon, *Scharpenbeg*, *supra*, dealt with *responses* to investigations *initiated* by the government. None of the cases deal with facts similar to this case, wherein BAE essentially launched the federal government's investigation of Meadows—in which Meadows, incidentally, was cleared of any wrongdoing—by submitting a disclosure to the DOD containing false and defamatory statements. Whatever policy rationale exists for immunizing from liability those who respond to government inquiries has no bearing when the private party speaks to the government of its own volition and on its own initiative.

BAE attempts to maneuver around this impediment by arguing that immunity "also applies when government contractors, such as BAE, initiate and provide reports pursuant to mandatory reporting obligations and federal regulations." (Memorandum in Support, ECF No. 6, at 11). In short, BAE contends its disclosure was mandatory pursuant to Federal Acquisition Regulations ("FAR") regulations, namely Section 52.203-13 of the FAR, "Contractor Code of Business Ethics and Conduct," which provides in part that federal contractors "shall timely disclose . . . whenever . . . the Contractor has credible evidence that a principal, employee, agent,

16

or subcontractor of the Contractor has committed . . . [a] violation of Federal criminal law involving fraud [or] conflict of interest."[11]

BAE cites no authority for the proposition that the United States could have "authorized" BAE's conduct, as required by *Yearsley*, *supra*, through generally applicable federal regulations. Indeed, under *Yearsley* and its progeny, the government must explicitly authorize the acts which form the basis of the claim against which the contractor asserts derivative sovereign immunity. *See, e.g.*, *Yearsley*, 309 U.S. at 20 (noting that the work for which the defendant could not be held liable was "authorized and directed by the governmental officers"); *Metzgar v. KBR, Inc. (In re KBR, Inc.)*, 744 F.3d 326, 345 (4th Cir. 2014) (holding that the defendant "is entitled to derivative sovereign immunity only if it adhered to the terms of its contract with the government"). BAE has provided no evidence that the FAR regulations it relies upon were incorporated into any contract it may have had with the United States; BAE does not even assert as much. Thus, BAE is not entitled to derivative sovereign immunity for its defamatory statements.

Even if the FAR regulations could serve as a basis for derivative sovereign immunity, they simply do not apply to Meadows' circumstances. BAE notified the DOD (and restated in its communications to the DON) that Meadows had mischarged a number of hours and had failed to disclose his dual-employment with Orbital ATK. These were, essentially, the same reasons BAE had offered to Meadows' in terminating his employment. (*See* Amended Complaint, ¶ 56). They were, however, mere pretexts for discharging Meadows; BAE was well aware of and had consented to Meadows' dual-employment, and there was no basis for it to allege that Meadows had overcharged any number of hours in his work for BAE. (*See id.* at ¶¶ 25 77, 79, 81, 83).

---

[11] BAE also relies on Section 3.1003(a) of the FAR, "Contractor Requirements," which provides similar language.

17

Because Meadows engaged in no criminal conduct involving fraud or conflict of interest, BAE lacked any "credible evidence" of the same. Accordingly, its disclosure to the DOD was by no means mandatory, precluding BAE's assertion of derivative sovereign immunity.

For these same reasons, the sole case cited by BAE that involved a government contractor receiving immunity for communications it initiated, *Becker v. Philco Corp.*, 372 F.2d 771 (4th Cir. 1967), is distinguished. There, the federal government's agreement with the defendant corporation required it to report "not only . . . actual but . . . [the] *suspected* compromise of classified information." *Id.* at 773. Here, by contrast, the FAR regulations relied upon by BAE require the contractor to have "credible evidence" of the enumerated conduct. As Meadows has alleged, BAE had no evidence, credible or otherwise, of Meadows' violating any conflict-of-interest policy or mischarging time when it made its statements to the DOD/DON. Indeed, the DON essentially concluded the same when it terminated Meadows' proposed debarment. (*See* Amended Complaint Ex. G).

BAE's argument fails regardless of whether this Court accepts Meadows allegations as true or considers evidence outside his pleadings. Under the under the latter approach, this Court may still view Meadows' allegations as evidence to be considered. *See Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768. Since BAE has provided no evidence aside from simply refuting Meadows' allegations, the only evidence before this Court is Meadows' allegations. Furthermore, BAE can "prevail only if the material jurisdictional facts are not in dispute and [it] is entitled to prevail as a matter of law." *Id.* Regardless of any evidence BAE may purport to have, credible or otherwise, whether Meadows violated any conflict-of-interest or timekeeping policies are material facts in this matter and, quite clearly, in dispute. Thus, it would be improper to dismiss Meadows'

defamation claims on the basis of derivative sovereign immunity.

###### 2. Derivative Sovereign Immunity Does Not Bar Meadows' Claim of Wrongful Discharge

Count III of Meadows' Amended Complaint is for wrongful discharge pursuant to *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985). This claim arises from BAE's termination of Meadows' employment, purportedly for Meadows' supposed violation of its conflict-of-interest and timekeeping policies but in actuality as retaliation for Meadows' failure to provide BAE with certain information belonging to Orbital ATK, which would have constituted unlawful behavior on Meadows' part. As with Meadows' defamation claims, BAE contends that it is protected from any liability under the doctrine of derivative sovereign immunity for discharging Meadows because it was performing its purportedly delegated, federal function in doing so. This argument likewise fails.

In support of its argument, BAE relies upon just two authorities: The Code of Federal Regulations and an unreported case, *Butters v. Vance Int'l*, No. 99-27-A, 1999 U.S. Dist. LEXIS 23721 (E.D. Va. July 30, 1999). Neither, however, adequately demonstrate that "the government authorized [BAE's] actions," *Metzgar*, 744 F.3d at 342 (citing *Yearsley*, 309 U.S. at 20-21), in terminating Meadows' employment.

The federal regulations cited by BAE provide:

(**b**) *Code of business ethics and conduct.*
    (**1**) Within 30 days after contract award, unless the Contracting Officer establishes a longer time period, the Contractor shall -
        (**i**) Have a written code of business ethics and conduct;
        (**ii**) Make a copy of the code available to each employee engaged in performance of the contract.
    (**2**) The Contractor shall -
        (**i**) Exercise due diligence to prevent and detect criminal conduct; and
        (**ii**) Otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

19

48 C.F.R. § 52.203-13(b)(1)-(2). BAE cites these regulations for the principle that they "requir[e] contractors to have an enforce [*sic*] codes of conduct and ethics policies."

Again, BAE cites no authority for the proposition that the United States could have "authorized" BAE's conduct, as required by *Yearsley*, *supra*, through generally applicable federal regulations like those found at 48 C.F.R. § 52.203-13(b)(1)-(2). Indeed, under *Yearsley* and its progeny, the government must explicitly authorize the acts which form the basis of the claim against which the contractor asserts derivative sovereign immunity. *See, e.g.*, *Yearsley*, 309 U.S. at 20 (noting that the work for which the defendant could not be held liable was "authorized and directed by the governmental officers"); *Metzgar v. KBR, Inc. (In re KBR, Inc.)*, 744 F.3d 326, 345 (4th Cir. 2014) (holding that the defendant "is entitled to derivative sovereign immunity only if it adhered to the terms of its contract with the government"). BAE has provided no evidence that the federal regulations it relies upon were incorporated into any contract it may have had with the United States; BAE does not even assert as much. Thus, BAE is not entitled to derivative sovereign immunity for its wrongful discharge of Meadows.

However, even if the cited regulations could serve as a basis for derivative sovereign immunity, they plainly say nothing regarding a contractor's *enforcement* of codes of conduct and ethics policies. Thus, the 48 C.F.R. § 52.203-13(b)(1)-(2) regulations cannot satisfy the *Yearsley* requirement that the federal government authorized the contractor's actions. That is because "the contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.'" *Cunningham*, 888 F.3d at 647 (citing *Metzgar*, 744 F.3d at 345). Furthermore, even if such instructions could be inferred from these regulations, they still say nothing regarding the termination of employees. To the extent BAE

would read into 48 C.F.R. § 52.203-13(b)(1)-(2) such a further inference, the connection between these regulations and BAE's termination of Meadows would be far too tenuous to satisfy the first prong of *Yearsley*. Derivative sovereign immunity hinges not merely on being a government contractor, but on the government's *actual authorization* of the contractor's actions.

In any event, Meadows has alleged—and there is no evidence to the contrary—that he did not, in fact, violate any of BAE's codes of conduct or ethics policies. Thus, even if the federal government *had* authorized BAE to discharge employees who violate BAE's codes of conduct or ethics policies, Meadows' discharge was under wholly different circumstances.

*Butters* is likewise of no help to BAE. In that case—which was brought under a motion for summary judgment under Rule 56 and not a motion to dismiss under Rule 12—the defendant terminated the plaintiff's employment in contravention of California's Fair Employment and Housing Act. *Butters*, 1999 U.S. Dist. LEXIS 23721 at *1-2. The plaintiff was a female security agent employed by the defendant; the defendant, in turn, provided security for a royal from Saudi Arabia. *Id.* at *2-3. When the defendant recommended the plaintiff for a certain position, the Saudi officials denied the request on the sole basis of the plaintiff's gender. *Id.* at *4. The Court recognized, and no one disputed, that the Saudi officials were immune as sovereigns or agents thereof, pursuant to the Foreign Sovereign Immunities Act. *Id.* at *5-7. The Court also held that the defendant was immune, derivatively, because it was acting directly under the foreign sovereign's orders; indeed, it even disagreed with the Saudi officials' decision. *Id.* at *10-11.

In this case, by contrast, the United States—the sovereign from whom BAE's immunity purportedly derives—did not order BAE to discharge Meadows. Indeed, to the extent the United States has had any involvement in Meadows' employment with BAE at all, it has sided with him; a far cry away from authorizing BAE's conduct. *(See* Amended Complaint, Ex. G (terminating

Meadows' proposed debarment)). If it is BAE's position that the United States has authorized it to discharge those who violate its rules regarding conflicts of interest and timekeeping, then there is still no basis for dismissing Meadow's wrongful discharge claim. BAE can "prevail only if the material jurisdictional facts are not in dispute and [it] is entitled to prevail as a matter of law." *Id.* Regardless of any evidence BAE may purport to have, credible or otherwise, whether Meadows violated any conflict-of-interest or timekeeping policies are material facts in this matter and, quite clearly, in dispute. Thus, it would be improper to dismiss Meadows' wrongful discharge claim on the basis of derivative sovereign immunity.

### 3. Derivative Sovereign Immunity Does Not Bar Meadows' Claims of Conspiracy and Business Conspiracy Because

Counts IV and V of Meadows' Amended Complaint are for common law conspiracy and business conspiracy pursuant to Virginia Code § 18.2-500.[12] Meadows' conspiracy claims arise from BAE and Orbital ATK conspiring to discharge Meadows from his respective employment with each company on false "conflict of interest" grounds. (*See* Amended Complaint ¶ 175). These false grounds also later served, in part, as the basis for BAE's defamatory communications to the DOD and DON. BAE once again contends that it is protected from any liability: "BAE is entitled to derivative sovereign immunity when reporting Meadows for fraud, conflict of interest and/or overbilling, and when acting to enforce its conflict of interest policy because all such conduct was delegate [*sic*] from the federal government to BAE." (Memorandum in Support, ECF No. 6, at 18).

For the reasons discussed above, BAE is not entitled to derivative sovereign immunity for its defamatory statements or termination of Meadows' employment. As with Meadows' other claims, BAE's argument fails regardless of whether this Court accepts Meadows allegations as

---

[12] Because the same analysis for the purposes of BAE's Motion to Dismiss applies to both claims, Meadows will discuss these claims together as conspiracy.

true or considers evidence outside his pleadings. Under the latter approach, this Court may still view Meadows' allegations as evidence to be considered. *See Richmond, Fredericksburg & Potomac R.R.*, 945 F.2d at 768. Meadows alleges, in part, that he did not commit any fraud, conflict of interest violation, or overbilling, and that, moreover, BAE was aware of these facts at all relevant times. Since BAE has provided no evidence aside from simply refuting Meadows' allegations, the only evidence before this Court is Meadows' allegations. Furthermore, BAE can "prevail only if the material jurisdictional facts are not in dispute and [it] is entitled to prevail as a matter of law." *Id.* Regardless of any evidence BAE may purport to have, credible or otherwise, whether Meadows violated any conflict-of-interest or timekeeping policies are material facts in this matter and, quite clearly, in dispute. Thus, it would be improper to dismiss Meadows' defamation claims on the basis of derivative sovereign immunity.

### 4. Conclusion as to Derivative Sovereign Immunity

As the foregoing demonstrates, BAE is not entitled to derivative sovereign immunity because (1) it has not shown that the United States authorized its actions, and (2) the authorities it contends show that its actions were authorized are, as a matter of law, insufficient. Furthermore, BAE's argument with respect to derivative sovereign immunity puts the cart before the horse. Consistent with its own arguments and authorities, BAE may, if at all, only be entitled to derivative sovereign immunity if it was *required by the federal government* to take the actions that it did (*i.e.*, conspire with Orbital ATK, make the statements it made to the DOD/DON, and terminate Meadows); BAE was only, if at all, *required* to do so if *both* (1) Meadows' allegations prove false and (2) BAE's own prove true. At this early stage, BAE has not, and indeed cannot, make such a showing. Accordingly, this Court should deny BAE's Motion to Dismiss insofar as it asserts derivative sovereign immunity for any of Meadows' claims.

23

## IV.    Meadows Claims for Wrongful Discharge and Business Conspiracy in Violation of Virginia Code § 18.2-500 Are Not Preempted Under the Federal Enclave Doctrine

BAE contends that Meadows' claims of wrongful discharge (Count III) and business conspiracy (Count V) are preempted by the federal enclave doctrine because those claims arose in the Arsenal, a purported federal enclave, and did not exist as causes of action in Virginia at the time the United States purportedly acquired exclusive jurisdiction over the Arsenal—or, more specifically, "Building 220," where Meadows' worked while on site at the Arsenal. However, as set forth in his contemptuously filed Motion to Remand and Memorandum in Support thereof, which is incorporated by reference as if fully set forth in this Memorandum, BAE has not shown that the Arsenal was a federal enclave at any time relevant to this action. Moreover, Meadows' claims of wrongful discharge and business conspiracy did not arise in the Arsenal; therefore, they are not preempted. Accordingly, BAE's basis for dismissing Meadows' claims of wrongful discharge and business conspiracy must be rejected.

## V.    Meadows Claim for Wrongful Discharge is Proper Under *Bowman*

Count III of Meadows' Amended Complaint is for wrongful discharge pursuant to *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985). This claim arises from BAE's termination of Meadows' employment, purportedly for Meadows' supposed violation of its conflict-of-interest and timekeeping policies but in actuality as retaliation for Meadows' failure to provide BAE with certain information belonging to Orbital ATK, which would have constituted unlawful behavior on Meadows' part. As alleged in the Amended Complaint, on three separate occasions, employees and/or agents of BAE directed Meadows to retrieve or otherwise utilize Orbital ATK's proprietary information, which Meadows had access to as a result of his fully disclosed concurrent employment with Orbital ATK. (*See* Amended Complaint, ¶¶ 151-155). Meadows refused, however, as such conduct would have been violative of criminal laws and public

24

policies prohibiting corporate espionage, including but not limited to the Virginia Uniform Trade Secrets Act ("VUTSA"), Virginia Code § 59.1-336, *et seq*; the Virginia Computer Crimes Act ("VCCA"), Virginia Code § 18.2-152.1, *et seq.*; and the Economic Espionage statute, 18 U.S.C. § 1831. (*See id.* at ¶¶ 156-159).

In *Bowman*, the Supreme Court of Virginia recognized a common law cause of action for wrongful discharge, creating an exception to the employment-at-will doctrine that permeates Virginia employment law. "*Bowman* . . . and its progeny have identified three types of exceptions." *McClosky v. Warren Co. Dep't of Soc. Servs.*, 81 Va. Cir. 35, 36 (Cir. Ct. 2010).

The first involves rights created by statute; this was the exception that *Bowman* itself dealt with. In *Bowman*, a corporation's board of directors demanded that employees vote in accordance with their wishes, but two employees refused and were subsequently discharged. The Court found that this termination was indeed wrongful, resulting in liability for the employer, because under former Virginia Code § 13.1-32 (now § 13.1-662) a stockholder was entitled to vote as he or she wished. Importantly, "former Code § 13.1-32 did not expressly state a public policy," but the Court "concluded that the statute *embodied* the public policy that a stockholder's right to vote shall be exercised free of duress and intimidation by corporate management." *Mitchem v. Counts*, 259 Va. 179, 189, 523 S.E.2d 246, 252 (2000).

The second exception occurs when there is a public policy "expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *Rowan v. Tractor Supply Company*, 263 Va. 209, 214, 559 S.E.2d 709, 711 (2002). While the public policy may be explicitly expressed, "'[l]aws that do not expressly state a public policy, but were enacted to protect the property rights, personal freedoms, health, safety, or welfare of the general public, may support a wrongful discharge claim if they

further an underlying, established public policy that is violated by the discharge from employment.'" *McFarland v. Va. Ret. Servs. of Chesterfield, L.L.C.*, 477 F. Supp. 2d 727, 735 (E.D. Va. 2007) (quoting *Mitchem*, 259 Va. at 189, 523 S.E.2d at 251).

The third exception occurs "where the discharge was based on the employee's refusal to engage in a criminal act." *Id.* "Although criminal statutes do not contain explicit statements of public policy, the protection of the general public from lawless acts is an unquestioned policy underlying such statutes." *Id.* The reasoning for this exception is fairly straightforward: "the General Assembly did not intend that the employment-at-will doctrine . . . serve as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." *Mitchem*, 259 Va. at 190, 523 S.E.2d at 252.

BAE maintains that none these exceptions apply to Meadows, arguing that federal law cannot serve as the basis for a *Bowman* wrongful discharge claim, and that the VUTSA and VCAA confer no rights, express no public policy, and do not include relevant criminal penalties. For the reasons discussed below, these arguments must be rejected.

### A.    Federal Criminal Statutes Can Serve as the Basis for a *Bowman* Claim

BAE cites several cases for the proposition that a *Bowman* claim "must find root in a state statute" and "cannot have its genesis in an act of Congress." *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 450-51 (E.D. Va. 2002) (quoting *McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998)). However, the Supreme Court of Virginia itself has never articulated such a rule; indeed, as Virginia's state courts have recognized, "no language in . . . [the] Supreme Court opinions limited the applicable public policies to those underlying state, rather than federal statutes." *McBroom v. DynCorp*, 38 Va. Cir. 109, 111 (Fairfax Cnty. 1995). "To reach

26

inconsistent results when the policy underlies state rather than federal public policies is to establish distinctions without a real difference." *Id.*[13]

Furthermore, the cases relied upon by BAE all involved *Bowman* claims of the first and second varieties. But the Economic Espionage statute, 18 U.S.C. § 1831, is a *criminal* statute, thereby placing any *Bowman* claim based on the refusal to engage in the conduct it prohibits in the third category. The purpose of the criminal statute exception to Virginia's at-will employment doctrine is to protect "the general public from lawless acts." *Rowan*, 263 Va. at 214, 559 S.E.2d at 711. That purpose applies in full force regardless of whether the underlying criminal statute is state or federal law. Indeed, providing a remedy to a person discharged for his or her refusal to engage in criminal conduct prohibited by federal law is not only consistent with *Bowman* and its progeny, but demanded by the reasoning of that line of cases. Accordingly, the Espionage Act can serve as the underlying public policy for a *Bowman* claim of wrongful discharge.

Finally, for the reasons set forth in his contemptuously filed Motion to Remand and Memorandum in Support thereof, which is incorporated by reference as if fully set forth in this Memorandum, BAE has not shown that the Arsenal was a federal enclave at any time relevant to this action. Thus, contrary to BAE's argument, the VUTSA and VCCA are not "federalized claims."

---

[13] Subsequent to the circuit court's decision in *McBroom*, the Supreme Court of Virginia decided *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 9, 465 S.E.2d 806 (1996). In that case, the Court noted in dicta that the plaintiff did "not have a cause of action for wrongful discharge because he [was] unable to identify any Virginia statute establishing a public policy." *Id.* at 98-99, 465 S.E.2d at 809. However, the plaintiff in *Brooks* did not attempt to rely on federal law. Accordingly, whether federal law may serve as the basis for any kind of *Bowman* claim remains an issue undecided by the Supreme Court of Virginia.

### B. The VUPSA Can Serve as the Basis for a *Bowman* Claim

The VUPSA prohibits the misappropriation of trade secrets. Misappropriation is defined by the VUPSA as follows:

**1.** Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
**2.** Disclosure or use of a trade secret of another without express or implied consent by a person who
    **a.** Used improper means to acquire knowledge of the trade secret; or
    **b.** At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
        **(1)** Derived from or through a person who had utilized improper means to acquire it;
        **(2)** Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
        **(3)** Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
        **(4)** Acquired by accident or mistake.

Va. Code § 59.1-336. Thus, the VUPSA prohibits both the acquisition and improper disclosure of trade secrets. Violations of the VUPSA can result in injunctive relief and damages. *See* Va. Code §§ 59.1-337, 59.1-338.

The VUPSA embodies Virginia's public policy protecting trade secrets from intellectual theft. Although such a policy is not explicitly stated in the statute, as a law protecting property rights the VUPSA can serve as the basis for a *Bowman* claim. *See Mitchem*, 259 Va. at 189, 523 S.E.2d at 251. Further, while the VUPSA provides remedies to the owners of trade secrets, its broad definition of misappropriation places Meadows within the class of persons entitled to the protection the public policy embodied by the VUPSA, as the VUPSA prohibits persons, including corporations, from acquiring trade secrets of another through a third party. Accordingly, the VUPSA can serve as the underlying public policy for a *Bowman* claim of wrongful discharge.

### C.    The VCCA Can Serve as the Basis for a *Bowman* Claim

The VCAA defines a number of computer crimes, *see* Va. Code § 18.2-152.2, and provides

penalties for, among other things, computer fraud:

> Any person who uses a computer or computer network, without authority and:
>     **1.** Obtains property or services by false pretenses;
>     **2.** Embezzles or commits larceny; or
>     **3.** Converts the property of another;
> is guilty of the crime of computer fraud.

Va. Code § 18.2-152.3. Contrary to BAE's argument, Meadows' allegations establish that, if he

were to comply with his BAE superiors' requests regarding Orbital ATK's proprietary

information, he would have likely been guilty of at least this section of the VCAA. For example,

Meadows' BAE supervisor, Michael Bate, request through electronic correspondence that

Meadows provide an Orbital ATK acid facility modernization proposal. (*See* Amended Complaint,

¶¶ 40, 152). If Meadows had complied, he would have used a computer to covert Orbital ATK's

property and may have only obtained that property under false pretenses. *See DTM Research,*

*L.L.C. v. AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (noting that "trade secrets are

considered property for various analyses" and that "one 'owns' a trade secret when one knows of

it, as long as it remains a secret"). Accordingly, the VCCA can serve as the underlying public

policy for a *Bowman* claim of wrongful discharge.

### D.    Conclusion as to Wrongful Discharge

For the above-stated reasons, Meadows' wrongful discharge claim is proper and consistent

with the principles articulated in *Bowman*, *supra*, and its progeny. Therefore, this Court should

deny BAE's Motion to Dismiss with respect to Meadows' wrongful discharge claim.

**VI.** **Meadows Has Sufficiently Pled the Elements of Conspiracy and Business Conspiracy in Violation of Virginia Code § 18.2-500, and He Has Pled Both Claims Consistent with Federal Pleading Standards**

Counts IV and V of Meadows' Amended Complaint are for common law conspiracy and business conspiracy pursuant to Virginia Code § 18.2-500.[14] These claims arise from BAE and Orbital ATK conspiring to discharge Meadows from his respective employment with each company on false "conflict of interest" grounds. (*See* Amended Complaint ¶ 175). These false grounds later served, in part, as the basis for BAE's defamatory communications to the DOD and DON. Meadows suffered a number of injuries as a result of this conspiracy, including those to his reputation, trade, business, and profession.

**A.** **The Plain Language of Virginia Code § 18.2-500 Supports Meadows' Claim for Business Conspiracy**

Virginia Code § 18.2-499 provides that

> [a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

And, pursuant to Virginia Code § 18.2-500,

> [a]ny person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, "damages" shall include loss of profits.

BAE cites cases for the proposition that the injuries described in Virginia Code § only apply when the malicious conduct is focused on one's business. *See, e.g.*, *Andrews v. Ring*, 266

---

[14] Because the same analysis for the purposes of removal and remand applies to both claims, Meadows will discuss these claims together as conspiracy.

Va. 311, 319 (2003). Meadows acknowledges *Andrews* and the federal cases that have cited it, but maintains that the plain language of the statute addresses "*reputation*, *trade*, business *or profession*." Va. Code § 18.2-499 (emphasis added). The Amended Complaint alleges how BAE and Orbital ATK's conspiracy damaged Meadows' in his reputation, trade, and profession, in that as a result of defamation and the termination of his employment with both BAE and Orbital ATK, Meadows (1) was unable to accept certain employment offers during the pendency of debarment proceedings; and (2) is still unable to accept certain employment offers due to Orbital ATK's placing of negative and false comments regarding Meadows in the Joint Personnel Adjudication System. (*See* Amended Complaint, ¶¶ 91-92). In short, the fact that BAE and Orbital ATK's conspiracy damaged Meadows' professional reputation puts such conduct squarely within the plain language of Virginia Code §§ 18.2-499 and 18.2-500.

## B. Meadows' Conspiracy Claims Satisfy the Liberal Rule 12(b)(6) Pleading Standard

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985). Torts, of course, may constitute the unlawful purpose element of a conspiracy claim. *See, e.g.*, *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 215, 754 S.E.2d 313, 317 (2014) (noting that "actions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious").

BAE seeks dismissal of Meadows' conspiracy claims on the basis that Meadows does not allege that BAE and Orbital ATK conspired to do any unlawful acts. However, as the arguments above demonstrate, Meadows' has sufficiently alleged a claim for wrongful discharge; thus, when

31

BAE terminated Meadows as a result, in part, of its conspiracy with Orbital ATK, BAE and Orbital ATK accomplished Meadows' wrongful discharge.

In addition, the defamation that resulted from BAE and Orbital ATK's conspiracy serves as an independent basis for Meadows' conspiracy claims. As the arguments above demonstrate, Meadows' has sufficiently alleged a claim for defamation against BAE, for which it can be held liable notwithstanding its unsupported assertion of derivative sovereign immunity. Further, it is immaterial that Meadows did not bring a claim for defamation against Orbital ATK (or, more precisely, NGIS), as under Virginia law, "while there must be proof of the underlying tort, the plaintiff is not required to plead a separate count, or be awarded a recovery, for the underlying tort." *Lance v. Wells Fargo Bank, N.A.*, 99 Va. Cir. 115, 124 (Chesapeake 2018); *see also* Witcher v. Reid, 70 Va. Cir. 415, 418 (Norfolk City 2006) ("In *Commercial Business Systems* [*v. Halifax Corp.*, 253 Va. 292, 300, 484 S.E.2d 892, 896 (1997)], the Supreme Court of Virginia Court stated that 'without ***proof*** of the underlying tort, there can be no conspiracy to commit that tort.' . . . Therefore, the viability of the conspiracy claim ***does not rest on pleading*** or collecting on the underlying tort claim ***but on showing*** that the underlying elements of that claim are present." (emphasis added)). BAE's argument to the contrary is without merit.

Lastly, BAE argues that Meadows' has failed to allege an agreement between BAE and Orbital ATK. BAE correctly notes that parallel conduct, by itself, cannot constitute a conspiratorial agreement. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("***Without more***, parallel conduct does not suggest conspiracy . . . ." (emphasis added)). By the same token, parallel conduct *can* suffice when "accompanied by 'plus factors.' While the Supreme Court has not recounted a list of plus factors, numerous plus factors, such as 'motive to conspire,' 'opportunity to conspire,' 'high level of interfirm communications,' irrational acts or acts contrary to a

defendant's economic interest, but rational if the alleged agreement existed, and departure from normal business practices, have been considered by other circuits." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *26 (4th Cir. Sep. 7, 1999).

Contrary to BAE's contention that Meadows has merely alleged "parallel conduct," Meadows alleges a number of facts signifying an agreement between BAE and Orbital ATK. For instance, there were interfirm communications in that Orbital ATK contacted BAE to discuss Meadows' dual-employment shortly before Meadows was terminated by Orbital ATK and escorted off-site by BAE, a prelude to his eventual termination by BAE. (*See* Amended Complaint, ¶¶ 53-56, 63-64). In addition, both BAE and Orbital ATK had independent motives to conspire against Meadows, namely Meadows' refusal to engage in corporate espionage and Meadows' refusal to take the job at Orbital ATK's affiliate, CNS. (*See id.* at ¶¶ 39-52, 58-70). These, coupled with Meadows' other allegations, such as the parallel conduct of BAE and Orbital ATK terminating Meadows, sufficiently allege an agreement between BAE and Orbital ATK under the Rule 12(b)(6) standard.

    **C.    Conclusion as to Conspiracy**

For the above-stated reasons, Meadows' conspiracy claims are sufficiently plead. Accordingly, this Court should deny BAE's Motion to Dismiss with respect to Meadows' conspiracy claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff Jeffrey S. Meadows respectfully requests that this Court deny Defendant BAE Systems, Inc.'s and BAE Systems Ordnance Systems, Inc.'s Motion to Dismiss in its entirety.

33

Respectfully submitted,

JEFFREY S. MEADOWS

By: /s/Daniel J. Martin
               Of Counsel

John R. Thomas, Jr. (VSB #75510)
Hafemann Magee & Thomas, LLC
11 Franklin Road, SW
P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660 (telephone)
(843) 645-6530 (facsimile)
jt@fed-lit.com

John P. Fishwick, Jr. (VSB #23285)
Monica L. Mroz (VSB #65766)
Carrol M. Ching, Esquire (VSB #68031)
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 (telephone).
(540) 345-5789 (facsimile).
John.fishwick@fishwickandassociates.com
Monica.mroz@fishwickandassociates.com
Carrol.Ching@fishwickandassociates.com
Daniel.martin@fishwickandassociates.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By:    <u>/s/Daniel J. Martin</u>
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 (telephone).
(540) 345-5789 (facsimile).
Daniel.martin@fishwickandassociates.com